J-S08043-17

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT I.O.P. 65.37**

| | | |
|---|---|---|
| IN THE INTEREST OF: A.M.M.F. | : | IN THE SUPERIOR COURT OF |
| | : | PENNSYLVANIA |
| | : | |
| | : | |
| | : | |
| | : | |
| | : | |
| APPEAL OF: S.F., NATURAL FATHER | : | No. 1512 WDA 2016 |

Appeal from the Decree September 9, 2016
In the Court of Common Pleas of Erie County
Orphans' Court at No(s):  No. 24 in Adoption 2016

BEFORE:   GANTMAN, P.J., FORD ELLIOTT, P.J.E., and SOLANO, J.

MEMORANDUM BY GANTMAN, P.J.:              **FILED FEBRUARY 13, 2017**

Appellant, S.F. ("Father"), appeals from the decree entered in the Erie County Court of Common Pleas Orphans' Court, which involuntarily terminated his parental rights to his minor child, A.M.M.F. ("Child").  Upon a thorough review of the record, we affirm.

In its opinion, the Orphans' court fully and correctly sets forth the relevant facts and procedural history of this case.  Therefore, we have no reason to restate them.[1]  After Father's counsel timely filed a notice of appeal and statement of intent to file an **Anders** brief pursuant to Pa.R.A.P. 1925(c)(4), counsel filed a petition for leave to withdraw in this Court on November 21, 2016.

---

[1] Erie County Office of Children and Youth Services ("ECOCY") filed the termination of parental rights petition on May 13, 2016.

As a preliminary matter, appellate counsel seeks to withdraw representation pursuant to *Anders v. California*, 386 U.S. 738, 87 S.Ct. 1396, 18 L.Ed.2d 493 (1967) and *Commonwealth v. Santiago*, 602 Pa. 159, 178-79, 978 A.2d 349, 361 (2009). *Anders* principles apply to appeals involving termination of parental rights. *See In re S.M.B.*, 856 A.2d 1235 (Pa.Super. 2004). *Anders* and *Santiago* require counsel to: 1) petition the Court for leave to withdraw, certifying that after a thorough review of the record, counsel has concluded the issues to be raised are wholly frivolous; 2) file a brief referring to anything in the record that might arguably support the appeal; and 3) furnish a copy of the brief to the appellant and advise him of the right to obtain new counsel or file a *pro se* brief to raise any additional points the appellant deems worthy of review. *Santiago, supra* at 173-79, 978 A.2d at 358-61; *In re Adoption of V.G.*, 751 A.2d 1174, 1176 (Pa.Super. 2000). Substantial compliance with these requirements is sufficient. *Commonwealth v. Wrecks*, 934 A.2d 1287, 1290 (Pa.Super. 2007). After establishing that counsel has met the antecedent requirements to withdraw, this Court makes an independent review of the record to confirm that the appeal is wholly frivolous. *Commonwealth v. Palm*, 903 A.2d 1244, 1246 (Pa.Super. 2006).

In *Santiago, supra*, our Supreme Court addressed the briefing requirements where court-appointed counsel seeks to withdraw representation on appeal:

Neither **Anders** nor **McClendon**[2] requires that counsel's brief provide an argument of any sort, let alone the type of argument that counsel develops in a merits brief. To repeat, what the brief must provide under **Anders** are references to anything in the record that might arguably support the appeal.

\* \* \*

Under **Anders,** the right to counsel is vindicated by counsel's examination and assessment of the record and counsel's references to anything in the record that arguably supports the appeal.

**Santiago, supra** at 176, 177, 978 A.2d at 359, 360. Thus, the Court held:

[I]n the **Anders** brief that accompanies court-appointed counsel's petition to withdraw, counsel must: (1) provide a summary of the procedural history and facts, with citations to the record; (2) refer to anything in the record that counsel believes arguably supports the appeal; (3) set forth counsel's conclusion that the appeal is frivolous; and (4) state counsel's reasons for concluding that the appeal is frivolous. Counsel should articulate the relevant facts of record, controlling case law, and/or statutes on point that have led to the conclusion that the appeal is frivolous.

**Id.** at 178-79, 978 A.2d at 361.

Instantly, Father's counsel filed a petition to withdraw. The petition states counsel conducted a conscientious review of the record and determined the appeal is wholly frivolous. Counsel also supplied Father with a copy of the brief and a letter explaining Father's rights to retain new counsel or to proceed *pro se* to raise any additional issues Father deems worthy of this Court's attention. (**See** Letter to Father, dated November 18,

---

2 **Commonwealth v. McClendon**, 495 Pa. 467, 434 A.2d 1185 (1981).

- 3 -

2016, attached to Petition for Leave to Withdraw as Counsel). In the amended **Anders** brief, counsel provides a summary of the facts and procedural history of the case. Counsel's argument refers to relevant law that might arguably support Father's issue. Counsel further states the reasons for her conclusion that the appeal is wholly frivolous. Therefore, counsel has substantially complied with the requirements of **Anders** and **Santiago**.

Counsel raises the following issues on Father's behalf:

> WHETHER THE [ORPHANS'] COURT [COMMITTED] AN ABUSE OF DISCRETION OR ERROR OF LAW WHEN IT CONCLUDED THAT…ECOCY ESTABLISHED GROUNDS FOR TERMINATION OF PARENTAL RIGHTS UNDER 23 PA.C.S.A. [§§ 2511(A)(1), (2), (5), AND (8)?]
>
> WHETHER THE [ORPHANS'] COURT COMMITTED AN ABUSE OF DISCRETION OR ERROR OF LAW WHEN IT CONCLUDED THAT THE TERMINATION OF [FATHER'S] PARENTAL RIGHTS WAS IN…CHILD'S BEST INTEREST [PURSUANT] TO 23 PA.C.S.A. [§] 2511(B)[?]

(**Anders** Brief at 4).

The standard and scope of review applicable in a termination of parental rights case is as follows:

> When reviewing an appeal from a decree terminating parental rights, we are limited to determining whether the decision of the trial court is supported by competent evidence. Absent an abuse of discretion, an error of law, or insufficient evidentiary support for the trial court's decision, the decree must stand. Where a trial court has granted a petition to involuntarily terminate parental rights, this Court must accord the hearing judge's decision the same deference that it would give to a jury verdict. We must employ a broad, comprehensive review of the

- 4 -

record in order to determine whether the trial court's decision is supported by competent evidence.

Furthermore, we note that the trial court, as the finder of fact, is the sole determiner of the credibility of witnesses and all conflicts in testimony are to be resolved by [the] finder of fact. The burden of proof is on the party seeking termination to establish by clear and convincing evidence the existence of grounds for doing so.

The standard of clear and convincing evidence means testimony that is so clear, direct, weighty, and convincing as to enable the trier of fact to come to a clear conviction, without hesitation, of the truth of the precise facts in issue. We may uphold a termination decision if any proper basis exists for the result reached. If the trial court's findings are supported by competent evidence, we must affirm the court's decision, even if the record could support an opposite result.

*In re Adoption of K.J.*, 936 A.2d 1128, 1131-32 (Pa.Super. 2007), *appeal denied*, 597 Pa. 718, 951 A.2d 1165 (2008) (internal citations omitted). *See also In re Adoption of C.L.G.*, 956 A.2d 999, 1003-04 (Pa.Super. 2008) (*en banc*).

CYS sought the involuntary termination of Father's parental rights on the following grounds:

**§ 2511. Grounds for involuntary termination**

**(a)  General Rule.**—The rights of a parent in regard to a child may be terminated after a petition filed on any of the following grounds:

(1)  The parent by conduct continuing for a period of at least six months immediately preceding the filing of the petition either has evidenced a settled purpose of relinquishing parental claim to a child or has refused or failed to perform parental duties.

(2) The repeated and continued incapacity, abuse, neglect or refusal of the parent has caused the child to be without essential parental care, control or subsistence necessary for his physical or mental well-being and the conditions and causes of the incapacity, abuse, neglect or refusal cannot or will not be remedied by the parent.

\* \* \*

(5) The child has been removed from the care of the parent by the court or under a voluntary agreement with an agency for a period of at least six months, the conditions which led to the removal or placement of the child continue to exist, the parent cannot or will not remedy those conditions within a reasonable period of time, the services or assistance reasonably available to the parent are not likely to remedy the conditions which led to the removal or placement of the child within a reasonable period of time and termination of the parental rights would best serve the needs and welfare of the child.

\* \* \*

(8) The child has been removed from the care of the parent by the court or under a voluntary agreement with an agency, 12 months or more have elapsed from the date of removal or placement, the conditions which led to the removal or placement of the child continue to exist and termination of parental rights would best serve the needs and welfare of the child.

\* \* \*

**(b) Other considerations.**—The court in terminating the rights of a parent shall give primary consideration to the developmental, physical and emotional needs and welfare of the child. The rights of a parent shall not be terminated solely on the basis of environmental factors such as inadequate housing, furnishings, income, clothing and medical care if found to be beyond the control of the parent. With respect to any petition filed pursuant to

subsection (a)(1), (6) or (8), the court shall not consider any efforts by the parent to remedy the conditions described therein which are first initiated subsequent to the giving of notice of the filing of the petition.

23 Pa.C.S.A. § 2511(a)(1), (2), (5), (8); and (b).

"Parental rights may be involuntarily terminated where any one subsection of Section 2511(a) is satisfied, along with consideration of the subsection 2511(b) provisions." *In re Z.P.*, 994 A.2d 1108, 1117 (Pa.Super. 2010).

Initially, the focus is on the conduct of the parent. The party seeking termination must prove by clear and convincing evidence that the parent's conduct satisfies the statutory grounds for termination delineated in Section 2511(a). Only if the court determines that the parent's conduct warrants termination of his…parental rights does the court engage in the second part of the analysis pursuant to Section 2511(b): determination of the needs and welfare of the child under the standard of best interests of the child.

*In re L.M.*, 923 A.2d 505, 511 (Pa.Super. 2007) (internal citations omitted).

Termination under Section 2511(a)(1) involves the following:

To satisfy the requirements of [S]ection 2511(a)(1), the moving party must produce clear and convincing evidence of conduct, sustained for at least the six months prior to the filing of the termination petition, which reveals a settled intent to relinquish parental claim to a child or a refusal or failure to perform parental duties. In addition,

Section 2511 does not require that the parent demonstrate both a settled purpose of relinquishing parental claim to a child and refusal or failure to perform parental duties. Accordingly, parental rights may be terminated pursuant to Section 2511(a)(1) if the parent either demonstrates a settled purpose of relinquishing parental claim to a child or fails to

perform parental duties.

Once the evidence establishes a failure to perform parental duties or a settled purpose of relinquishing parental rights, the court must engage in three lines of inquiry: (1) the parent's explanation for his…conduct; (2) the post-abandonment contact between parent and child; and (3) consideration of the effect of termination of parental rights on the child pursuant to Section 2511(b).

*In re Z.S.W.*, 946 A.2d 726, 730 (Pa.Super. 2008) (internal citations omitted). Regarding the six-month period prior to filing the termination petition:

[T]he trial court must consider the whole history of a given case and not mechanically apply the six-month statutory provision. The court must examine the individual circumstances of each case and consider all explanations offered by the parent facing termination of his…parental rights, to determine if the evidence, in light of the totality of the circumstances, clearly warrants the involuntary termination.

*In re B.,N.M.*, 856 A.2d 847, 855 (Pa.Super. 2004), *appeal denied*, 582 Pa. 718, 872 A.2d 1200 (2005) (internal citations omitted).

The grounds for termination of parental rights under Section 2511(a)(2), due to parental incapacity that cannot be remedied, are not limited to affirmative misconduct; to the contrary those grounds may include acts of refusal as well as incapacity to perform parental duties. *In re A.L.D.*, 797 A.2d 326, 337 (Pa.Super. 2002). "Parents are required to make diligent efforts towards the reasonably prompt assumption of full parental responsibilities." *Id.* at 340. The fundamental test in termination of parental rights under Section 2511(a)(2) was long ago stated in the case of

*In re Geiger*, 459 Pa. 636, 331 A.2d 172 (1975), where the Pennsylvania Supreme Court announced that under what is now Section 2511(a)(2), "the petitioner for involuntary termination must prove (1) repeated and continued incapacity, abuse, neglect or refusal; (2) that such incapacity, abuse, neglect or refusal caused the child to be without essential parental care, control or subsistence; and (3) that the causes of the incapacity, abuse, neglect or refusal cannot or will not be remedied." *In Interest of Lilley*, 719 A.2d 327, 330 (Pa.Super. 1998).

"Termination of parental rights under Section 2511(a)(5) requires that: (1) the child has been removed from parental care for at least six months; (2) the conditions which led to removal and placement of the child continue to exist; and (3) termination of parental rights would best serve the needs and welfare of the child." *In re Z.P., supra* at 1118.

"[T]o terminate parental rights under Section 2511(a)(8), the following factors must be demonstrated: (1) [t]he child has been removed from parental care for [twelve] months or more from the date of removal; (2) the conditions which led to the removal or placement of the child continue to exist; and (3) termination of parental rights would best serve the needs and welfare of the child." *In re Adoption of M.E.P.*, 825 A.2d 1266, 1275-76 (Pa.Super. 2003).

Under Section 2511(b), the court must consider whether termination will meet the child's needs and welfare. *In re C.P.*, 901 A.2d 516, 520

(Pa.Super. 2006). "Intangibles such as love, comfort, security, and stability are involved when inquiring about the needs and welfare of the child. The court must also discern the nature and status of the parent-child bond, paying close attention to the effect on the child of permanently severing the bond." *Id.* Significantly:

> In this context, the court must take into account whether a bond exists between child and parent, and whether termination would destroy an existing, necessary and beneficial relationship. When conducting a bonding analysis, the court is not required to use expert testimony. Social workers and caseworkers can offer evaluations as well. Additionally, Section 2511(b) does not require a formal bonding evaluation.

*In re Z.P., supra* at 1121 (internal citations omitted).

"The statute permitting the termination of parental rights outlines certain irreducible minimum requirements of care that parents must provide for their children, and a parent who cannot or will not meet the requirements within a reasonable time following intervention by the state, may properly be considered unfit and have his…[parental] rights terminated." *In re B.L.L.*, 787 A.2d 1007, 1013 (Pa.Super. 2001). This Court has said:

> There is no simple or easy definition of parental duties. Parental duty is best understood in relation to the needs of a child. A child needs love, protection, guidance, and support. These needs, physical and emotional, cannot be met by a merely passive interest in the development of the child. Thus, this court has held that the parental obligation is a positive duty which requires affirmative performance.
>
> This affirmative duty encompasses more than a financial obligation; it requires continuing interest in the child and a genuine effort to maintain communication and association

with the child.

Because a child needs more than a benefactor, parental duty requires that a parent exert himself to take and maintain a place of importance in the child's life.

Parental duty requires that the parent act affirmatively with good faith interest and effort, and not yield to every problem, in order to maintain the parent-child relationship to the best of his…ability, even in difficult circumstances. A parent must utilize all available resources to preserve the parental relationship, and must exercise reasonable firmness in resisting obstacles placed in the path of maintaining the parent-child relationship. Parental rights are not preserved by waiting for a more suitable or convenient time to perform one's parental responsibilities while others provide the child with [the child's] physical and emotional needs.

*In re B.,N.M., supra* at 855 (internal citations omitted). "[A] parent's basic constitutional right to the custody and rearing of his…child is converted, upon the failure to fulfill his…parental duties, to the child's right to have proper parenting and fulfillment of…her potential in a permanent, healthy, safe environment." *Id.* at 856.

Importantly, neither Section 2511(a) nor Section 2511(b) requires a court to consider at the termination stage, whether an agency provided a parent with reasonable efforts aimed at reunifying the parent with his children prior to the agency petitioning for termination of parental rights. *In re D.C.D.*, 629 Pa. 325, 342, 105 A.3d 662, 672 (2014). An agency's failure to provide reasonable efforts to a parent does not prohibit the court from granting a petition to terminate parental rights under Section 2511. *Id.* at 346, 105 A.3d at 675.

After a thorough review of the record, the briefs of the parties, the applicable law, and the well-reasoned opinion of the Honorable Robert A. Sambroak, Jr., we conclude Father's issues on appeal merit no relief. The Orphans' Court opinion comprehensively discusses and properly disposes of the questions presented. (**See** Orphans' Court Opinion, filed November 4, 2016, at 9-12) (finding: preservation of Father's parental rights is not acceptable option in this case; when court adjudicated Child dependent, court informed Father that completion of his permanency plan goals was necessary to obtain custody of Child; nevertheless, Father did little to address any of his goals while Child was in placement; Father failed to comply with his epilepsy treatment goal as demonstrated by Father's failure to take medication regularly, attend doctor's visits, and submit to routine bloodwork; in fact, Father's noncompliance with doctor's prescribed course of action almost led to Father's discharge from treatment; Father also failed to comply with his housing goal, which required him to obtain safe and suitable housing; Father lived in home without utilities from September 2015 to January 2016, and did not show any urgency to change his housing situation; Father also continued to reside with unsuitable roommates, who had lengthy criminal records; significantly, ECOCY's attempts to address housing with Father were further thwarted by Father's decision to change homes and phone numbers without updating ECOCY; additionally, no bond exists between Father and Child; during visits, Father focused on his own

personal needs and failed to interact with Child; Father took interest in Child only when Father believed Child would be adopted; Child's pre-adoptive home meets her needs and allows Child to reach her developmental milestones; at this point, refusal to terminate Father's parental rights will leave Child in state of instability and confusion, which is not in her best interest; thus, court properly terminated Father's parental rights pursuant to Sections 2511(a)(1), (2), (5), (8), and (b)).  According, we affirm on the basis of the trial court opinion and grant counsel's petition to withdraw.

Decree affirmed; counsel's petition to withdraw is granted.


Judgment Entered.

_____
Joseph D. Seletyn, Esq.
Prothonotary


Date:  2/13/2017

IN THE MATTER OF       :     IN THE COURT OF COMMON PLEAS
THE ADOPTION OF       :     OF ERIE COUNTY, PENNSYLVANIA
A.M.M.F.                :     ORPHANS' COURT
                       :
                       :     DOCKET NO. 24 IN ADOPTION 2016

## 1925(a) OPINION

On September 8, 2016, a decree was entered terminating the parental rights of the natural

father, S.F. ("Father") , to his minor child, A.M.M.F. He filed a

timely Notice of Appeal and a Statement of Intent to File Anders Brief. A review of the record

reflects there are no issues of merit and that the Agency met its burden in establishing grounds

for termination under 23 Pa. C.S.A. §2511(a)(1), (a)(2), (a)(5), (a)(8), and (b) by clear and

convincing evidence. It is therefore respectfully requested the Superior Court affirm the decree.

### PROCEDURAL HISTORY AND FACTS

In March, 2015 A.M.M.F. was removed from the mother's care due to the mother's

significant cognitive limitations. At the time of the child's removal, Father was not the

primary caregiver for the child. Since her birth, Father had been only minimally involved in

the child's life. Father has epilepsy, and, at the time of the child's removal, received no

regular medical care to treat his condition for at least one year. *Court Summary, 1/25/16, p. 1.*

On March 25, 2015, the child was adjudicated dependent. Each parent stipulated to the

facts underlying the basis for the adjudication, including Father's minimal involvement

with the child, and untreated epileptic condition. *Court Summary, 7/6/15, p. 1.*

A dispositional hearing took place on April 22, 2015.

A permanency review hearing followed on July 6, 2015. At the conclusion of this

hearing, the trial court ordered the child remain in foster care. *Permanency Review Order,*

*7/8/15, p. 2.* Father , though compliant with the treatment plan, had yet to obtain stable or

1



FILED NOV 04 2016 Register of Wills

suitable housing. Domestic violence between his roommates was still an issue in his current living arrangement. Father was also not medically cleared by his neurologist to provide care for his daughter unsupervised, though he was receiving medication to control his seizures. *Court Summary, 7/6/15, p. 6.*

A second permanency review hearing took place on October 21, 2015. The trial court was troubled by Father's new criminal charges, lack of suitable housing, and sporadic participation with Healthy Families of America. Though Father relocated in September, 2015, at the time of the October hearing, he had yet to connect utility services to the home. *Permanency Review Hearing Transcript, 10/21/15, p. 12. See also Court Summary, 10/21/15, p. 5.* On several occasions, when a caseworker went to Father's residence to determine its suitability for visits, Father's roommates would not give the worker access to the home. *Permanency Review Hearing, 10/21/15, p. 21.* Due to Father's living arrangements, visitation was no longer permitted in the home by the Agency. *Id. at 12.*

Testimony from a caseworker established Father was difficult to contact and that he did not reach out for services. *Permanency Review Hearing Transcript, 10/21/15, p. 10.* He did not have a reliable phone and switched phone numbers six times in as few as two months preceding the review hearing. *Permanency Review Hearing Transcript, 10/21/15, p. 19. See also Court Summary, 10/21/15, p. 7.*

Father's neurological condition remained unaddressed. Father's caseworker accompanied him to his last neurological appointment in September, 2015. Staff informed the worker that Father was a "noncompliant patient" to the point where they were "thinking of discharging him from the practice." Since April, 2015, the doctor's office ordered Father to complete bloodwork on three separate occasions. Father failed to follow through.

2

*Permanency Review Hearing Transcript, 10/21/15, p. 11.* The neurologist reported concerns about Father's ability to successfully and safely parent and care for himself so long as his neurological condition remained unaddressed. *Court Summary, 10/21/15, p. 5.*

Though concerned with Father's circumstances, lack of initiative and progress, the Agency felt he required more time to remedy the issues, and expressed a desire to continue to work with Father. *Permanency Review Hearing Transcript, 10/21/15, p. 9-10.* At the conclusion of this hearing, reunification remained a goal though a concurrent goal of adoption was added.

A third permanency review hearing took place on January 25, 2016. On this day, Father was also arraigned on several minor misdemeanor criminal charges. The trial court learned Father continued to reside in the home he obtained in September, 2015 without utility services. He then moved to a new residence with new roommates whose full names he did not know. *Permanency Review Hearing Transcript, 1/25/16, p. 41.*

Father also remained inconsistent with his neurological medication and treatment recommendations, and failed to follow through with obtaining a blended case manager to help him with his medical care. *Permanency Review Hearing Transcript, 1/25/16, p. 17.* His blood work over the past year still indicated he had not consistently taken his medication.

At the time of the January hearing, Father only sporadically participated in treatment with Healthy Families of America and still persisted in minimal follow-through. He missed at least five scheduled visits. At least one of these misses occurred because he was "having seizures and" was "out of it." *Court Summary, 1/25/16, p. 7.*

When Father appeared for scheduled visitation, his interactions and bond with the child were minimal, until the visit prior to the January hearing, when Father believed his

3

child was going to be put up for adoption. *Court Summary, 1/25/16, p. 8. See also Permanency Review Hearing Transcript, 1/25/16, p. 19.*

Workers again testified it was often hard to reach Father because he did not have a reliable phone or phone number. *Permanency Review Hearing Transcript, 1/25/16, p. 15.*

After determining the Agency made reasonable efforts to prevent or eliminate the need to remove A.M.M.F. from Father, and that his circumstances remained unchanged, the Agency's request to change the goal to adoption was granted. Services to Father were terminated and the child was placed in a pre-adoptive home. The Agency was directed to file a petition for a termination hearing as soon as practicable.

Thereafter, Father appealed the change of goal. The Superior Court affirmed the trial court's decision permitting the change of goal to adoption in a non-precedential decision filed on August 22, 2016 at docket 340 WDA 2016.

The hearing to terminate Father's parental rights was held on September 8, 2016. Father's noncompliance with his seizure medication, inability to emotionally connect with the child and meet her needs, as well as his own, and inability to obtain or maintain stable housing remained hallmarks of the Agency's case against Father.

Testimony from caseworkers indicated Father was unable to maintain stable, safe, and suitable housing. Brian Hillen, Father's caseworker for the Healthy Families America Program, indicated he attempted to assist Father in readying his home for visitation with the child and to otherwise make Father's living arrangements clean and safe. *Involuntary Termination of Parental Rights Hearing Transcript, 9/8/16, p. 42.*

However, Father changed residences and contact information so frequently that not only was it difficult for the worker to maintain contact with Father, but it was also nearly

4

impossible to ready Father's living space for visitation. By Father's own admission to Hillen, at least one of his residences was "extremely unsafe and was not suitable for a child to be there," so Father never allowed the Agency to visit the home. *Involuntary Termination of Parental Rights Hearing Transcript, 9/8/16, p. 45-49, 102.*

Location of Father's residences notwithstanding, Hillen, and Father's caseworker with the Agency could not follow through with visits to Father's homes because Father failed to update the workers with his new address and contact information. On visits where workers knew where Father was living, many times Father was either not present at the time of the visit, or Father's roommates would deny the workers access. *Involuntary Termination of Parental Rights Hearing Transcript, 9/8/16, p. 45-49, 100-101.* Many of Father's roommates had lengthy criminal histories or prior Agency involvement. Instead of finding a place of his own to live, Father fought the Agency over his choice of roommates, stating the workers were "too judgmental." *Involuntary Termination of Parental Rights Hearing Transcript, 9/8/16, p. 103.*

Despite constant reminders Father needed to keep the Agency and his other caseworkers updated with his contact information, and Father's assurances he would do that "next time," Father continued to change addresses and telephone numbers without informing either the Agency or other service providers. *Involuntary Termination of Parental Rights Hearing Transcript, 9/8/16, p. 101.*

Testimony from other Agency's witnesses, including Father's healthcare provider, revealed shared concern over Father's untreated epileptic condition and mental health, which significantly affected Father's ability to safely parent the child and care for his own needs. At the time services for Father were opened, it was made clear to him

5

treatment of his condition was important for his overall health and for the health and safety of his child. Agency workers were particularly concerned with the threat Father could pose to the child should he remain untreated, and have a seizure while alone with the child. Nonetheless, Father once more failed to follow through with recommendations from his caseworkers or medical providers, and never followed through with directives to obtain a blended case manager or participate in individual therapy. *Involuntary Termination of Parental Rights Hearing Transcript, 9/8/16, p. 52-53, 102-103.*

General noncompliance and failure to follow-through with medical appointments continued to highlight Father's behavior. From the time Father began treating with Northshore to the time he was discharged, he only appeared at four of thirteen scheduled appointments. Father's bloodwork also showed the levels of medication in his system were "subtherapuetic," meaning Father was not taking his medication as prescribed, if at all. Though Father's bloodwork from October, 2015 was in the therapeutic range, Father failed to show for subsequent blood work as ordered, making it impossible to determine whether Father stayed on course or was again noncompliant with his medication regimen. *Involuntary Termination of Parental Rights Hearing Transcript, 9/8/16, p. 86-88.*

Father's Agency caseworker described him as disinterested and generally "not invested" in the treatment he needed to control his condition. Given Father's lack of compliance and condition, the Agency worker was confident the child would be placed in an unsafe position if left alone with Father. *Involuntary Termination of Parental Rights Hearing Transcript, 9/8/16, p. 104-105.*

Finally and perhaps most significantly, service providers were greatly concerned with Father's inability to connect with the child on an emotional level and meet her basic needs.

6

Mr. Hillen began working with Father before the child's adjudication to help Father emotionally connect with the child and learn how to parent. *Involuntary Termination of Parental Rights Hearing Transcript, 9/8/16, p. 42.*

Despite Father's early progress, he soon demonstrated an inability to emotionally connect with her or understand her basic cues. Not only was Father unresponsive to the child's cues, he expressed little enthusiasm about caring for her and often focused his attention elsewhere. The Agency's caseworker testified on one occasion, she tried to "model for him how to play with [the child,]" but Father wasn't interested, never made eye contact while feeding her, and used his visitation time to complain or talk to providers about his own needs. *Involuntary Termination of Parental Rights Hearing Transcript, 9/8/16, p. 111.*

Mr. Hillen testified he witnessed an incident where the child crawled over to Father and pulled or tugged on his leg asking to be picked up. However, Father would not acknowledge her. The child began to cry and fuss, but Father only reached down to pat her on the head and continued on with his own conversation. At other times, Father's movements and contact with the child appeared "robotic." Hillen noted visits with the child turned into discussions about Father's personal needs and care. The longer the visits went on, the less the child went to Father for attention. Instead, she focused on either Hillen or the other case aid in the room. *Involuntary Termination of Parental Rights Hearing Transcript, 9/8/16, p. 50-51, 52, 62.*

One of the few times Hillen testified he saw Father engage with the child was at Father's last visit, where he appeared to engage with her merely because he thought she was going to be put up for adoption. *Involuntary Termination of Parental Rights Hearing Transcript, 9/8/16, p. 64.*

7

According to another service provider, Father's most glaring deficiency was his lack of emotional connection and interaction with the child. *Involuntary Termination of Parental Rights Hearing Transcript, 9/8/16, p. 54.* No service provider could say they were comfortable with Father having unsupervised visits with the child. *Involuntary Termination of Parental Rights Hearing Transcript, 9/8/16, p. 60,*

It was clear at the time of the termination hearing / Father. made little progress with his treatment plan, and failed to remedy any of the conditions that lead to the child's placement.

Above all, workers testified the child needed continued stability in order to stay developmentally on track. Allowing Father . to maintain his parental rights would disrupt this stability, especially since the child showed no signs of attachment or bond to ' Father ., and was not distressed in any way after separation from him. In the workers' opinion, it was in the child's best interests Father's , rights be terminated. Giving Father additional time to remedy the initial conditions which led to her placement would only prolong the inevitable. *Involuntary Termination of Parental Rights Hearing Transcript, 9/8/16, p. 70-73, 78, 105-107, 113, 123.*

At the conclusion of the termination hearing, the trial court determined the Agency established grounds for termination under 23 Pa.C.S.A. §2511(a)(1), (a)(2), (a)(5), and (a)(8) by clear and convincing evidence and that termination of Father's parental rights was in the child's bests interests pursuant to 23 Pa.C.S.A. §2511(b).

Counsel for Father filed a notice of appeal and Statement of Intent to File *Anders* Brief on October 6, 2016.

8

## ISSUES PRESENTED

After review of the record, the only issue of possible arguable merit that could be raised on appeal is one challenging the sufficiency of the evidence supporting the trial court's findings under subsections (a)(1), (a)(2), (a)(5), (a)(8), and (b).

## STANDARD OF REVIEW

When reviewing a trial court's decision to grant or deny a termination of parental rights petition, an appellate court should apply an abuse of discretion standard, accepting the trial court's findings of fact and credibility determinations if they are supported by the record, and reversing only if the trial court made an error of law or abused its discretion. *In re S.P., 47 A.2d 817, 826 (Pa. 2011)*. "[A] decision may be reversed for an abuse of discretion only upon demonstration of manifest unreasonableness, partiality, prejudice, bias, or ill-will." *Id.*

The appellate court may affirm the trial court's decision regarding the termination of parental rights with regard to any one subsection of 2511(a). *In re M.T., 101 A.3d 1163, 1179 (Pa. Super. 2014)(en banc)*.

## DISCUSSION

In a termination of parental rights hearing, the initial focus is on the conduct of the parent. The Agency "must prove by clear and convincing evidence that the parent's conduct satisfies the statutory grounds for termination delineated in Section 2511(a)." *In re L.M., 923 A.2d 505, 511 (Pa. Super. 2007)*. Once these statutory grounds exist, the court may analyze whether it is in the best interests of the child for parental rights to be terminated. *Id.* One major aspect of this analysis includes "the nature and status of the emotional bond between parent and child, with close attention paid to the effect on the child of permanently severing any such bond." *Id.*

9

Further, "the statute permitting the termination of parental rights outlines certain irreducible minimum requirements of care that parents must provide for their children. A parent who cannot or will not meet the requirements within a *reasonable time* following intervention by the state may properly be considered unfit and have [his] parental rights terminated." *In re B.L.L., 787 A.2d 1007, 1013 (Pa. Super. 2001).*

Preserving Father's parental rights is not an acceptable option in this case. The record demonstrates by clear and convincing evidence termination of his rights was proper.

At the time the child was adjudicated dependent, it was made clear to Father obtaining safe and stable housing suitable for the child and himself, addressing his epilepsy and mental health, and learning to provide for the child's basic needs were crucial to Father's success. Through the testimony presented at the termination hearing, it was obvious Father did little to address these concerns, resulting in the child's continued placement with the Agency.

Father was not compliant with his epilepsy treatment and failed to obtain mental health treatment. Father failed to take his medication regularly, failed to attend follow-up visits, and failed to submit to doctor-ordered EEG's and blood work to monitor his condition and medication compliance. Father missed nine out of thirteen scheduled appointments. When Father chose to submit to bloodwork, many times the results showed the medication in his system was at a "subtherapuetic" level. *Involuntary Termination of Parental Rights Hearing Transcript, 9/8/16, p. 86-88.* Father continued to have seizures, and was nearly discharged from the practice for his noncompliance. Caseworkers were concerned Father's continued seizures would pose a safety concern for the child should Father have an episode while the child was alone with him. *Involuntary Termination of Parental Rights Hearing Transcript, 9/8/16, p. 60.*

10

Father's inability to address the Agency's concerns about his housing further showcase his lack of progress and inability to provide for the child. Father lived in a home from September, 2015 through early January, 2016 without utilities. He appeared in no hurry to remedy this condition, nor did he appear to understand how lack of suitable housing and his choice of roommates, many of whom had lengthy criminal records or involvement with the Agency, affected his ability to see his daughter. *Involuntary Termination of Parental Rights Hearing Transcript, 9/8/16, p. 45-49, 102, 103.* The caseworkers' attempts to address housing with Father were further thwarted by Father's decision to change homes and phone numbers without updating them, making consistent contact with Father impossible. *Involuntary Termination of Parental Rights Hearing Transcript, 9/8/16, p. 45-49, 100-101.*

The testimony at the termination hearing also established no bond existed between the child and Father ., and it was in the child's best interests Father's rights be terminated. Father's Agency caseworker testified Father used his visitation time with the child to complain or speak to providers about his personal needs, instead of focusing his attention on the child. *Involuntary Termination of Parental Rights Hearing Transcript, 9/8/16, p. 111.* Father's caseworker through the Erie Family Center testified to specific instances where Father refused to engage with the child when she asked for attention, causing the child to redirect her focus on the other adults in the room. Father only appeared to take an interest in his daughter when he believed she was going to be put up for adoption. *Involuntary Termination of Parental Rights Hearing Transcript, 9/8/16, p. 50-51, 52, 62, 64.* The child was not distressed in any way when a visit with Father ceased, and she was transferred back to the pre-adoptive resource. *Involuntary Termination of Parental Rights Hearing Transcript, 9/8/16, p. 70-73, 78, 105-107, 113, 123.*

11

The child's needs are being met in the pre-adoptive home. The child reached her developmental milestones, and is not in need of services. Refusal to terminate Father's parental rights would only prolong the inevitable, and leave the child in a state of instability and confusion, something not in her best interests. *Involuntary Termination of Parental Rights Hearing Transcript, 9/8/16, p. 70-73, 78, 105-106, 123.*

## CONCLUSION

Father consistently demonstrated he was unwilling to address any of the issues that brought A.M.M.F. into the Agency's care. Clear and convincing evidence exists to show termination of Father's parental rights was proper and serves the best interests of the child. It is respectfully requested the Superior Court affirm the Decree terminating Father's parental rights to the child.

Dated this 4 day of November, 2016.

BY THE COURT:

_____ J.
ROBERT A. SAMBROAK, JR.

cc:   Kevin Jennings, Esq.
OCY Legal Department

Patricia Ambrose, Esq.
731 French Street
Erie, PA 16501

Charles Sacco, Esq.
525 West 10th Street
Erie, PA 16502

Elizabeth Brew Walbridge, Esq.
1001 State Street, Suite 1400
Erie, PA 16501

12